PKC:LXN
F.#2009R01508

M-11-560

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

    - against -

MARLON PAUL,

        Defendant.

- - - - - - - - - - - - - - - - - - -x

**To Be Filed Under Seal**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR
ARREST WARRANT
(T. 18, U.S.C., § 1349)

EASTERN DISTRICT OF NEW YORK, SS:

    JANE MASON, being duly sworn, deposes and states that I am a Special Agent with the Federal Bureau of Investigation (the "FBI"), duly appointed according to law and acting as such.

    Upon information and belief, there is probable cause to believe that in or about and between March 2006 and September 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MARLON PAUL, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, contrary to Section 1343 of Title 18 of the United States Code.

2

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Special Agent with the FBI for approximately twenty-five years and I am currently assigned to a white-collar crime squad, which investigates violations of federal criminal laws including fraud and other financial crimes. In this position, I have conducted physical surveillance, interviewed witnesses, reviewed extensive documents obtained through the service of subpoenas, and used other investigative techniques to secure relevant information for use in criminal prosecutions.

2. The facts set forth in this affidavit were developed as a result of an investigation conducted by myself and other law enforcement officers, interviews of witnesses and the review and analysis of documents and records relating to the case.

3. Because the purpose of this affidavit is limited to setting forth probable cause to arrest, I have not set forth every fact of which I am aware pertaining to this investigation. Where I relate statements, conversations and actions of others, those statements, conversations, and actions are related in substance and in part, except where otherwise indicated.

4.  Upon information and belief, during the period of this conspiracy, the defendant Marlon Paul conducted business as a mortgage broker and was employed by "Concord Mortgage" and "ABC Funding." The defendant was also a co-owner of "RSN Diversified" ("RSN") which was also a mortgage-related business.

### The Scheme To Defraud Lenders

5.  Between in or about March 2006 and September 2006, the defendant, together with others, engaged in a scheme to defraud lenders by obtaining mortgage loans by fraudulent means in the name of straw buyers. The scheme involved recruiting straw buyers to invest in real estate. The Defendant used the straw buyers to obtain 100%-financed mortgage loans to purchase property. The straw buyers submitted uniform residential loan applications ("Mortgage Applications") to lenders that contained false information concerning, among other things, employment, salary and assets. The defendant assisted in preparing the supporting documents in connection with the loans.

6.  The defendant selected the properties to be purchased by the straw buyers. In addition, the defendant, together with others, told the straw buyers that the defendant would arrange for the first year's worth of mortgage payments to be put into an escrow account from which the straw buyers could make their mortgage payments, and that after one year, the seller would buy back the property or that the property would otherwise

be taken out of the straw buyer's name. The defendant, however, did not in fact put funds into escrow accounts sufficient for the straw buyers to make monthly payments on the properties, which properties went into foreclosure and/or were sold in "short-sales."[1]

**The Transactions**

The Transaction for 219-05 94th Drive, Jamaica, New York

7. In or about June 2006, Straw Buyer #1 submitted a Mortgage Application, dated June 15, 2006, to New Century Mortgage Corp. ("Lender #1") to fund two mortgages, the first in the amount of $384,000, and the second in the amount of $96,000, for the purchase of a property located at 219-05 94th Drive, Jamaica, New York ("219-05 94th Drive").[2]

8. The 219-05 94th Drive Mortgage Application and supporting documentation submitted by Straw Buyer #1 contained false information, regarding, among other things, her finances, which Lender #1 used to determine whether she qualified for the loan.

A. Straw Buyer #1 stated that she earned a base monthly salary of $11,650 per month from Wizard Building and Construction Corp. ("Wizard"), where she claimed to have been

---

[1] In general, a "short sale" is a sale of property in which the sale proceeds fall short of the balance owed to the lender on the property's mortgage loan.

[2] To cover the full purchase price of 219-05 94th Drive, Straw Buyer #1 applied for both a "first" and a "second" mortgage with Lender #1.

employed as a project manager for five years. I have interviewed a co-owner of Wizard who informed me that Straw Buyer #1 never worked at Wizard and that he did not recognize her name. Based on a review of Straw Buyer #1's true employment and payroll records, I have determined that Straw Buyer #1's actual income at and around the time the application was prepared and through the date of the closing was approximately $4,800 a month.

   B. Straw Buyer #1 stated that she intended to make 219-05 94th Drive her primary residence. I have interviewed Straw Buyer #1, and she admits that she did not intend to reside at this residence.

   9. On or about June 15, 2006, the real estate closing for 219-05 94th Drive took place. I have reviewed records showing that Lender #1 wired the Mortgage Loans through New Jersey into the settlement attorney's escrow account at a bank in New York. I have also reviewed the closing documents that reflect the disposition of the Mortgage Loans.[3] $53,655.60 of the Mortgage Loan proceeds were paid by check to RSN, a business co-owned by the defendant. On June 19, 2006, a wire transfer of $10,000 was sent to the defendant from RSN.

---

[3] I have reviewed the records associated with the settlement attorney's escrow account.

Case 1:11-cr-00664-ENV   Document 1   Filed 05/27/11   Page 6 of 11 PageID #: 6

6

10. A review of public property records indicates that both loans on 219-05 94th Drive went into default and that the property was sold in a short-sale.

## The Transaction for 648 Monroe, Brooklyn, New York

11. In or about June 2006, Straw Buyer #1 and Straw Buyer #2 submitted a joint Mortgage Application, dated June 22, 2006, to Columbia Home Loans, LLC ("Lender #2")[4] to fund two mortgages, the first in the amount of $600,000 and the second in the amount of $150,000, for the purchase of the property located at 648 Monroe, Brooklyn, New York ("648 Monroe").[5] The 648 Monroe Mortgage Application listed Straw Buyer #1 and Straw Buyer #2 as the prospective purchasers.

12. The 648 Monroe Mortgage Application and supporting documentation submitted by Straw Buyer #1 and Straw Buyer #2 contained false information regarding, among other things, their finances, which Lender #2 used to determine their suitability for the loan.

    A. Straw Buyer #1 stated that she earned a base monthly salary of $5,800 per month from Wizard, where she claimed to have been employed as a project manager for five years. As previously discussed, I have interviewed a co-owner of Wizard who

---

[4] Lender #2 is an FDIC-insured financial institution.

[5] To cover the full purchase price of 648 Monroe, Straw Buyer #1 and Straw Buyer #2 applied for both a "first" and "second" mortgage with Lender #2.

informed me that Straw Buyer #1 never worked at Wizard and that he did not recognize her name.

B.  Straw Buyer #2 stated that he earned a base monthly salary of $7,650 per month from Melody One Inc. ("Melody"), where he claimed to have been employed as a movie producer for the past three years.  I have interviewed the owner of Melody, who informed me that Straw Buyer #2 was not a movie producer and instead made deliveries and drove a truck to various job locations, and that Straw Buyer #2 was never paid more than $100 in a single day.  In addition, I have interviewed Straw Buyer #2 who admitted that at and around the time the application was prepared and through the date of the closing, he earned $10,000 per year.

C.  Straw Buyer #1 and Straw Buyer #2 claimed that they intended for 648 Monroe to be their primary residence, which they now both admit was untrue.

D.  Straw Buyer #1 failed to disclose that she had previously purchased 219-05 94th Drive and held two mortgages on that property.

E.  Straw Buyer #1 and Straw Buyer #2 claimed to have $28,706 in a Chase bank account.  I have reviewed records associated with this account, which reveal that Straw Buyer #1 and Straw Buyer #2 did not own this account nor did they have signing authority for it.  Instead, the records reflect that this Chase bank account was owned by an employee of ABC Funding, which also employed the defendant.

8

F.  Straw Buyer #1 and Straw Buyer #2 claimed to have $27,761 in another Chase bank account. I have been informed by Chase that this account does not exist.

13.  On or about June 22, 2006, the real estate closing for 648 Monroe took place. I have reviewed records showing that Lender #2 wired the Mortgage Loans through New Jersey into the settlement attorney's escrow account at a bank in New York. I have also reviewed the closing documents that reflect the disposition of those Mortgage Loans.[6] $111,968 of the Mortgage Loan proceeds were paid by check to RSN, a business co-owned by the defendant. $6,000 of the Mortgage Loan proceeds were paid by check to ABC Funding, which also employed the defendant.

14.  I have interviewed Straw Buyer #2, who stated that he was approached by the defendant about acting as the straw buyer for 648 Monroe and that he was offered $10,000 for doing so. Straw Buyer #2 stated that the defendant told him that mortgage payments for the first year would come out of an escrow account and that after one year, the defendant would transfer or otherwise take the property out of Straw Buyer #2's name. After the closing, the defendant deposited $7,000 into Straw Buyer #2's bank account.

15.  A review of public property records indicates that both loans on 648 Monroe went into default and the property was sold in a short-sale.

---

[6]  I have reviewed the records associated with the settlement attorney's escrow account.

## The Transaction for 453 Cameron, Elmont, New York

16. In or about June 2006, Straw Buyer #2 submitted a Mortgage Application, dated June 28, 2006, to Lender #1 to fund two mortgages, the first in the amount of $489,600 and the second in the amount of $122,400, for the purchase of the property located at 453 Cameron, Elmont, New York ("453 Cameron").[7]

17. The 453 Cameron Mortgage Application and supporting documentation submitted by Straw Buyer #2 contained false information regarding, among other things, his finances, which Lender #1 used to determine his suitability for the loan.

   A. Straw Buyer #2 stated that he earned a base salary of $13,650 per month from Melody where he claimed to have been employed as a movie producer for the past three years. As previously discussed, I have interviewed the owner of Melody who informed me that Straw Buyer #2 was not a movie producer and instead made deliveries and drove a truck to various job locations, and that Straw Buyer #2 was never paid more than $100 in a single day. In addition, I have interviewed Straw Buyer #2 who admitted that at and around the time the application was prepared and through the date of the closing, he earned $10,000 per year.

   B. Straw Buyer #2 claimed that he intended for 453 Cameron to be his primary residence, which he now admits was untrue.

---

[7] To cover the full purchase price of 648 Monroe, Straw Buyer #2 applied for both a "first" and a "second" mortgage with Lender #1.

C. Straw Buyer #2 failed to disclose that he had previously purchased 648 Monroe and held two mortgages on that property.

18. On or about June 28, 2006, the real estate closing for 453 Cameron took place. I have reviewed records showing that Lender #1 wired the Mortgage Loans through New Jersey into the settlement attorney's escrow account at a bank in New York. I have also reviewed the closing documents that reflect the disposition of those Mortgage Loans.[8] $46,199 of the Mortgage Loan proceeds were paid by check to RSN, a business co-owned by the defendant. On the same day, June 28, 2006, a wire transfer of $60,000 was sent to the defendant from RSN. $6,000 of the Mortgage Loan proceeds was paid by check to ABC Funding, which also employed the defendant.

19. A review of public property records indicates that the "second" mortgage loan on 453 Cameron went into default and that the property has gone into foreclosure.

20. I have interviewed Straw Buyer #2, who stated that he was approached by the defendant about acting as the Straw Buyer for 453 Cameron and was told that the same terms that applied for the purchase of 648 Monroe would apply here. Specifically, the defendant told Straw Buyer #2 that mortgage payments for the first year would come out of an escrow account and that after one year, the defendant would transfer or otherwise take the property out of

---

[8] I have reviewed the records associated with the settlement attorney's escrow account.

11

Straw Buyer #2's name. After the closing, the defendant deposited $13,000 into Straw Buyer #2's bank account.

### Ongoing Investigation

21. As previously indicated, numerous other individuals were involved in the defendant's fraudulent mortgage scheme. Several of these individuals have not been arrested and, upon information and belief, are unaware of this investigation. Disclosure of this investigation, which is ongoing, or the defendant's arrest could result in the flight of targets, the destruction of evidence and witness tampering.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued so that the defendant MARLON PAUL may be dealt with according to law.

WHEREFORE, your deponent further respectfully requests that this affidavit be and remain sealed until further order of the Court.

_____
JANE MASON
Special Agent
Federal Bureau of Investigation

Sworn to before me this
27th day of May, 2011

HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK